## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MARYLAND

## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| | * | |
| **KATHARINE HUMPHREYS** | * | |
| 20645 Shadyside Way | | |
| Germantown, MD 20874 | * | |
| | | |
| *Plaintiff* | * | **Case No: 8:26cv-01677-TDC** |
| | | |
| v. | * | |
| | | |
| **U.S. FERTILITY, LLC** | * | |
| d/b/a Shady Grove Fertility | | |
| 9601 Blackwell Drive | * | |
| Rockville, Maryland 20850 | | |
| | * | |
| *Defendant* | | |

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Katharine Humphreys, by counsel, files this Amended Complaint against

Defendant U.S. Fertility, LLC, and states as follows:

## PARTIES

1. Plaintiff Katharine Humphreys is an adult resident of Maryland.

2. Plaintiff worked as an Embryologist at U.S. Fertility, LLC.

3. Defendant U.S. Fertility, LLC d/b/a Shady Grove Fertility is a limited liability

company doing business in Maryland with its principal Maryland office located at 9601

Blackwell Drive, Rockville, Maryland 20850.

4. At all relevant times, Defendant employed more than fifty (50) employees and was an employer within the meaning of Maryland FEPA, the Maryland Wage Payment and Collection Law, the Americans with Disabilities Act and the Family and Medical Leave Act.

## JURISDICTION AND VENUE

5. This Court has jurisdiction pursuant to Md. Code, Cts. & Jud. Proc. § 1-501, as the causes of action arise under Maryland statutes, and federal law enforceable in state court.

6. Venue is proper in Montgomery County because Defendant's principal office is located within the County and the events giving rise to the claims occurred there.

7. Plaintiff has satisfied all administrative prerequisites to suit.

## FACTUAL BACKGROUND

8. Plaintiff is a woman who began employment with Defendant on March 7, 2016. During her employment, Plaintiff held multiple roles, including Patient Service Representative, Patient Care Coordinator, Embryology Lab Assistant, and Embryologist.

9. On December 18, 2022, Plaintiff began work in Defendant's embryology track as an Embryology Lab Assistant.

10. Shortly thereafter, Plaintiff transitioned into a full-time Embryologist position.

11. In addition to her primary clinical responsibilities, Plaintiff was assigned to several internal teams, including the Disposition Team and Thaw Paperwork Preparation and Coordination.

12.    Plaintiff initially volunteered assistance to the Disposition Team and later became an official member in 2023.

13.    The Disposition Team handled patient gamete disposition processing, including document handling, verification of patient consent documentation, and adherence to required chain-of-custody and compliance procedures.

14.    At the time Plaintiff joined the team, the Disposition Team consisted of four Senior Embryologists.

15.    In June 2023, a senior colleague retired after holding a specialized role for more than ten years.

16.    Prior to that colleague's retirement, Plaintiff was trained to assume the responsibilities of that position.

17.    The training included access to additional databases and systems, including the Gateway portal, necessary to perform the role.

18.    The responsibilities required extensive review and verification of patient documentation, consent records, and disposition documentation to ensure compliance with operational and regulatory requirements.

19.    As Plaintiff transitioned into the role, she discovered that the existing processes had not been structured to support continuity.

20.    Plaintiff was required to reconstruct and redevelop the processes to ensure operational and compliance requirements were met given the patient volume.

21.    After the colleague's retirement, Plaintiff assumed responsibility for document preparation, document revision, scheduling coordination, and policy verification related to patient gamete disposition.

22.     Defendant did not formally announce the transfer of these responsibilities.

23.     Defendant did not adjust Plaintiff's title at that time.

24.     Defendant did not adjust Plaintiff's compensation despite the substantial expansion of duties.

25.     These responsibilities were absorbed into Plaintiff's daily workload.

26.     Management characterized the expanded duties as manageable and described them as a trade-off for Plaintiff to receive an accommodated work schedule.

27.     Over time, Plaintiff's responsibilities expanded beyond the historical scope of the position.

28.     Plaintiff was expected to maintain the role's core functions, restructure processes, and coordinate the work of other employees in addition to her normal duties.

29.     These responsibilities exceeded the scope of Plaintiff's assigned position.

30.     On March 17, 2024, Plaintiff formally received the title Senior Embryologist.

31.     Prior to receiving this title, Plaintiff had already been performing senior-level and managerial duties for an extended period.

32.     Plaintiff's responsibilities included clinical embryology work, administrative duties, process development, staff training, and operational oversight.

33.     Plaintiff's workload expanded both clinically and administratively.

34.     Plaintiff remained subject to the same productivity and scheduling expectations as colleagues who did not carry these additional responsibilities.

35.     When Plaintiff raised these concerns, management indicated that the additional work was intended to ensure Plaintiff's workday remained fully occupied.

36. Plaintiff frequently worked longer hours than similarly situated colleagues.

37. Plaintiff was excluded from premium-pay shifts that previously served as a form of compensation associated with accommodated scheduling.

38. Plaintiff was often required to remain beyond scheduled hours to complete procedures and clinical work so that earlier-shift employees could leave. These additional hours were not tracked or compensated.

39. Although classified as a salaried employee, Plaintiff's hours were tracked and managed on a pay-period basis.

40. Plaintiff was required to make up missed hours within the same pay period to reach a total of eighty hours.

41. Scheduling requests required managerial approval.

42. Plaintiff's workload was managed in a manner consistent with hourly labor control despite her salaried classification.

43. On May 17, 2024, Plaintiff contacted Human Resources to request leave under the Family and Medical Leave Act ("FMLA").

44. Plaintiff began protected medical leave under the FMLA on May 31, 2024, due to serious mental health conditions including ADHD.

45. Plaintiff was later diagnosed with Borderline Personality Disorder.

46. Plaintiff remained on approved FMLA leave from May 31, 2024, through November 6, 2024.

47. During this time, Plaintiff participated in ongoing outpatient psychiatric and psychological treatment, including medication management.

48. During Plaintiff's leave, colleagues informed her that her social media activity was being monitored and discussed in the workplace.

49. Plaintiff was informed that some employees questioned the legitimacy of her medical leave and referred to it as a "vacation." Plaintiff was further informed that her supervisor referred to her as "sick" when discussing her leave with other employees.

50. On at least one occasion, Plaintiff's supervisor sent an email to the Embryologist team stating that Plaintiff was out sick and working with Human Resources.

51. These discussions occurred while Plaintiff remained on approved medical leave.

52. During Plaintiff's leave, workplace discussions concerning Plaintiff's medical leave, mental health conditions, and personal life continued among employees.

53. Plaintiff later learned that former employee, Rachel Pallister, despite no longer being employed by Defendant, remained involved in workplace discussions concerning Plaintiff's mental health, medical leave, and social media activity.

54. Plaintiff was informed that employees discussed and monitored Plaintiff's social media activity and questioned the legitimacy of her medical leave.

55. Upon information and belief, at all relevant times, management personnel were aware these discussions were taking place while Plaintiff was on leave.

56. Shortly before returning to work, Plaintiff was discharged from treatment earlier than planned because Human Resources demanded that she return sooner than her anticipated treatment completion date, stating that her continued absence would create an undue hardship. Defendant did not explain the alleged hardship.

57.     Plaintiff returned to work on November 7, 2024. On the same day, she met with her supervisor to request reasonable accommodations for her documented mental health conditions.

58.     Plaintiff requested accommodations including a standardized schedule with no weekend shifts, an adjustable start time, 5–10 minute breaks, the ability to use headphones to reduce sensory overload, and a more isolated workspace.

59.     During this meeting, Plaintiff explained the medical reasons for needing each requested accommodation, including her Borderline Personality Disorder diagnosis. Plaintiff felt the tone of her supervisor's questioning during this meeting was judgmental and effectively required to disclose details of her mental health conditions, including her recently diagnosed borderline personality disorder, which she had intended to keep confidential due to stigma associated with the condition.

60.     On November 8, 2024, Mr. Han emailed Plaintiff, copying James Graham and the Benefits team, regarding the accommodation request.

61.     Mr. Graham participated in discussions concerning Plaintiff's return to work following her medical leave and received information regarding Plaintiff's workplace treatment, accommodation requests, and return-to-work issues from other management personnel.

62.     Upon information and belief, prior to Plaintiff's return, Taer Han discussed Plaintiffs return with employees and solicited employee opinions regarding her return to work.

63.    Plaintiff was later informed by coworker Mika Rhabb that, before Plaintiff returned from leave, Mr. Han asked multiple employees how they felt about Plaintiff returning to work.

64.    Plaintiff was informed that her leave status and return became a topic of workplace discussion among staff after employees were told Plaintiff was out "sick."

65.    Upon information and belief, Plaintiff's coworkers

66.    Mr. Han stated that Plaintiff could only be excused from weekend rotations through the end of the year because weekend and holiday rotations were essential to the role.

67.    Mr. Han approved a later start time ending around 5:00 p.m. and approved Plaintiff's request for short breaks and the use of noise-cancelling headphones outside the laboratory.

68.    Mr. Han and Mr. Graham denied Plaintiff's request for a more isolated workspace, stating that office space could only be used when Plaintiff performed administrative tasks.

69.    Defendant also denied Plaintiff's request for a designated workspace, stating that no such space was available.

70.    Plaintiff observed that other employees maintained informal "claimed" workspace areas within the facility.

71.    Despite Plaintiff raising this issue, Defendant denied her request.

72.    As a result, Plaintiff was forced to locate workspace wherever it was available on a daily basis.

73.     Two coworkers ultimately allowed Plaintiff to share a small workspace with them.

74.     The workspace lacked natural light and was cramped, conditions which Plaintiff found exacerbated her depressive symptoms.

75.     Upon returning from leave, Plaintiff experienced isolation and lack of acknowledgment from colleagues.

76.     Plaintiff experienced the isolation immediately upon her return to work and raised concerns regarding that treatment with management.

77.     During a meeting following her return from leave, Plaintiff informed both Mr. Han and Mr. Graham that she had experienced isolation and retaliatory treatment from coworkers immediately upon returning to the workplace.

78.     Plaintiff concerns were also referenced in her performance evaluation, which acknowledged the difficulties she faced upon return from FMLA leave.

79.     Throughout her return to work, multiple coworkers informed Plaintiff that conversations about her were occurring between staff and management.

80.     Plaintiff was informed that management personnel were aware of the discussions and that the conversations extended beyond her immediate work group.

81.     Coworkers later admitted their involvement in isolating and excluding Plaintiff.

82.     Plaintiff discovered that the name tag on her assigned locker had been removed while her belongings remained inside.

83. Plaintiff later spoke with Cristina Applegate regarding the workplace treatment, noting management's awareness of the gossip, and the discussions occurring between management and staff about her.

84. During the conversation, Ms. Applegate acknowledged her own participation in Plaintiff's isolation and workplace treatment.

85. Ms. Applegate further acknowledged the existence of discussions concerning Plaintiff within the workplace and did not dispute Plaintiff's understanding that management was aware of and participating in some of those discussions.

86. Plaintiff's conversation with Ms. Applegate confirmed her understanding that management, including Mr. Graham, was aware of the coworker gossip and treatment towards her.

87. Because Plaintiff's accommodation included a modified schedule of approximately 8:30 a.m. to 5:00 p.m., Plaintiff was excluded from incentive-paying late shifts.

88. These late shifts began later in the morning and ended around 5:15 p.m., resulting in shorter hours being worked while providing additional compensation.

89. Despite being excluded from these shifts, Plaintiff was often required to remain beyond her scheduled hours to complete clinical work, including unfinished work from earlier-shift employees.

90. Plaintiff received no additional compensation for these extended hours.

91. Plaintiff raised concerns regarding her work environment, exclusion from coworkers, and treatment following her return from leave.

92. Plaintiff discussed the anxiety and stress caused by the work environment with supervisory personnel.

93. After learning that former employee Ms. Pallister was returning to work, Plaintiff informed supervisor Luis Colturato that Ms. Pallister's return caused significant anxiety because of Ms. Pallister's prior involvement in discussions concerning Plaintiff and conduct Plaintiff believed contributed to her workplace distress.

94. Upon information and belief, Mr. Graham was aware of these concerns, yet no meaningful intervention occurred.

95. During the months following Plaintiff's return from leave, supervisors repeatedly asked Plaintiff how things were going with other staff members, demonstrating awareness that workplace issues involving Plaintiff continued to exist.

96. On November 15, 2024, the first scheduled pay day after her return, Plaintiff realized she had not been paid for the prior week's work.

97. On November 15, 2024, Plaintiff emailed Jamie Creel, Payroll Administrator, asking whether she would receive a paycheck.

98. Ms. Creel initially stated that Plaintiff should have received a paycheck for prior weeks' work.

99. Later that same day, Ms. Creel informed Plaintiff that because she had missed ten pay periods, her paycheck would be applied toward benefits arrears.

100. Plaintiff's paycheck issued on November 15, 2024, was withheld in its entirety.

101. Paychecks issued on November 29, 2024, and December 13, 2024, were also withheld in full.

102.    Defendant withheld one hundred percent (100%) of Plaintiff's earned wages for three consecutive pay periods.

103.    Defendant informed Plaintiff that approximately $10,000 in wages were being withheld to repay benefits premiums incurred during her leave.

104.    Plaintiff repeatedly contacted Payroll, Human Resources, Benefits, and management seeking documentation and explanation.

105.    Human Resources acknowledged that the leave documentation Plaintiff signed did not specify any percentage deduction or authorize withholding one hundred percent of her wages.

106.    Defendant nevertheless continued withholding Plaintiff's entire paycheck.

107.    Plaintiff therefore received no compensation for several weeks of work despite actively performing her job duties.

108.    Plaintiff informed Defendant that the withholding created severe financial hardship and required her to seek financial assistance from family members.

109.    Plaintiff repeatedly requested clarification regarding the amount allegedly owed for benefit arrears and the basis for the wage withholding.

110.    Defendant provided inconsistent information regarding the amounts allegedly owed and failed to provide complete documentation explaining the full amount being withheld despite Plaintiff's repeated requests.

111.    Defendant did not offer a repayment plan or alternative payment arrangement.

112.    The withholding of Plaintiff's wages reduced her effective compensation below the Maryland minimum wage.

113.    On December 12, 2024, after not receiving a response to her two prior inquiries, Plaintiff again contacted the Benefits Team regarding the withheld paychecks.

114.    Human Resources responded that Plaintiff had initialed a leave form stating she was responsible for premiums incurred during unpaid leave.

115.    The form stated that unpaid premiums would be taken in arrears in accordance with company policy.

116.    The form did not identify the referenced policy or disclose that Defendant could withhold one hundred percent of Plaintiff's wages.

117.    In August 2025, Plaintiff learned that Defendant later provided another employee with an individual workspace after complaints of workplace distractions, despite previously denying Plaintiff's request for a designated workspace.

118.    After Defendant denied Plaintiff's request for a designated workspace accommodation. Plaintiff ultimately arranged her own workspace with coworkers in an effort to minimize the isolation and hostility she was experiencing within the department.

119.    Management was aware of Plaintiff's workspace concerns and the circumstances that led Plaintiff to seek alternative arrangements.

120.    Despite that knowledge, upon information and belief, management took no meaningful action taken by management to investigate or address the coworker harassment.

121.    Additionally, despite Human Resources Supervisor, Deirdre Dubuc, being copied on Plaintiff's communications to management regarding her treatment, she never

responded. Ms. Dubuc also did not respond to emails Plaintiff sent directly to her regarding the harassment.

122.    On or about August 18, 2025, Plaintiff filed a charge of discrimination with the EEOC. In her charge, Plaintiff alleged that she was subjected to disability discrimination and reprisal for oppositional activity, taking FMLA, and requesting reasonable accommodation.

123.    In her EEOC charge, Plaintiff also asserted she was denied reasonable accommodations, subjected to disparate treatment, and her paycheck was unlawfully withheld.

124.    On October 9, 2025, Plaintiff was approved for short-term disability benefits through January 1, 2026.

125.    Plaintiff received a Notice of Right to Sue dated December 16, 2025, from the appropriate administrative agency.

126.    Plaintiff later provided Defendant documentation extending her short-term disability benefits through January 9, 2026.

127.    On January 5, 2026, Defendant's Benefits Team emailed Plaintiff stating that she was scheduled to return to work on January 9, 2026, and requested a Fitness for Duty form.

128.    On January 7, 2026, Plaintiff was approved for long-term disability benefits through October 25, 2027.

129.    On or about January 13, 2026, Plaintiff submitted a Fitness for Duty form stating that she was unable to return to work and had entered a treatment program through January 30, 2026.

130.    On January 15, 2026, Defendant stated that if Plaintiff did not provide additional documentation, Defendant would consider her to have voluntarily resigned effective January 9, 2026.

131.    On February 3, 2026, Defendant's HR Business Partner, Amanda Oakes, emailed Plaintiff that Defendant was terminating her effective immediately. Ms. Oakes referenced Plaintiff's medical leave and stated that Defendant could no longer hold her position.

132.    Plaintiff has exhausted all administrative prerequisites to filing this lawsuit.

133.    As a result of Defendant's unlawful conduct, Plaintiff has suffered lost wages, financial hardship, emotional distress, and other damages.

### COUNT I – Violation of Maryland Wage Payment and Collection Law

134.    Plaintiff realleges and incorporates paragraphs 1 through 105 as though fully restated herein.

135.    Defendant deducted and withheld earned wages from Plaintiff's paycheck in violation of Md. Code, Lab. & Empl. §§ 3-503 and 3-505.

136.    The deductions were not expressly authorized in writing by Plaintiff, as required by law.

137.    Plaintiff was harmed as a result of the deductions.

138.    Plaintiff is entitled to unpaid wages, treble damages, attorneys' fees, and costs under § 3-507.2.

### COUNT II – Violation of Maryland Minimum Wage Law

139.    Plaintiff realleges and incorporates paragraphs 1 through 105 as though fully restated herein.

140.    Following Plaintiff's return from FMLA leave, Defendant reduced her wages to zero for three consecutive pay periods.

141.    The Maryland minimum wage during the relevant period was fifteen (15) dollars per hour.

142.    Defendant paid Plaintiff less than the minimum wage required by law.

143.    Plaintiff was harmed as a result of the damages.

144.    Plaintiff is entitled to unpaid wages, treble damages, attorneys' fees, and costs under § 3-427.

### COUNT III – Disability Discrimination in Violation of Maryland FEPA

145.    Plaintiff realleges and incorporates paragraphs 1 through 75 as though fully restated herein.

146.    Plaintiff has qualifying disabilities within the meaning of Maryland FEPA.

147.    At all relevant times, Plaintiff was qualified to perform the essential functions of her position with or without reasonable accommodation.

148.    Defendant was aware of Plaintiff's medical conditions.

149.    Defendant treated Plaintiff less favorably than similarly situated employees with regard to the assignment of work, promotions, and work hours.

150.    Defendant treated Plaintiff less favorably than similarly situated employees regarding assigned workspaces.

151.    Defendant subjected Plaintiff to adverse employment actions, including withholding her wages and termination, shortly after she took medical leave.

152.   Defendant's actions were motivated, at least in part, by Plaintiff's disability.

153.   Defendant's conduct constitutes disability discrimination under Md. Code, State Gov't § 20-606.

### COUNT V – Failure to Accommodate in Violation of Maryland FEPA

154.   Plaintiff realleges and incorporates paragraphs 1 through 105 as though fully restated herein.

155.   Plaintiff is a qualified individual with disabilities within the meaning of Maryland FEPA.

156.   At all relevant times, Plaintiff was qualified to perform the essential functions of her position with or without reasonable accommodation.

157.   Defendant failed to reasonably accommodate Plaintiff.

158.   Defendant's conduct constitutes disability discrimination under Md. Code, State Gov't § 20-601; 20-606.

### COUNT IV – Reprisal in Violation of FEPA

159.   Plaintiff realleges and incorporates paragraphs 1 through 105 as though fully restated herein. Plaintiff is a qualified individual with disabilities within the meaning of Maryland FEPA.

160.   At all relevant times, Plaintiff was qualified to perform the essential functions of her position with or without reasonable accommodation.

161.   Defendant subjected Plaintiff to adverse employment actions, including withholding her wages and termination, shortly after she requested took protected medical leave.

162.    Defendant subjected Plaintiff to adverse employment actions, including withholding her wages and termination, shortly after she requested reasonable accommodations.

163.    Defendant subjected Plaintiff to adverse employment actions, including withholding her wages and termination, shortly after she engaged in protected EEO activity.

164.    Defendants' actions were motivated, at least in part, by Plaintiff's protected activity.

165.    Defendant's conduct constitutes disability discrimination under Md. Code, State Gov't § 20-601; 20-606.

### COUNT V - FMLA Retaliation and Interference

166.    Plaintiff realleges and incorporates paragraphs 1 through 105 as though fully restated herein.

167.    During the relevant period, Plaintiff was an eligible employee under the FMLA.

168.    During the relevant period, Defendant was an employer covered by the FMLA.

169.    Plaintiff took FMLA leave.

170.    Defendant subjected Plaintiff to adverse employment actions because of her FMLA leave.

171.    Defendant's conduct constitutes unlawful retaliation under 29 U.S.C § 2615.

172. Plaintiff is entitled to lost wages, lost benefits, out-of-pocket medical expenses, liquidated damages, interest, equitable relief, attorneys' fees, and costs under 29 U.S.C. § 2617.

## COUNT VI – Hostile Work Environment

173. Plaintiff realleges and incorporates paragraphs 1 through 105 as though fully restated herein.

174. Defendant assigned Plaintiff additional work; subjected her to increased scrutiny; and encouraged Plaintiff's isolation in the work place.

175. Defendant's management, including James Graham and Taer Han, knew or should have known that Plaintiff was being isolated, excluded, discussed among supervisors and staff, subjected to workplace gossip concerning her mental health and medical leave, and treated differently following her return from protected leave. Management received direct complaints from Plaintiff, participated in discussions concerning Plaintiff's return to work, was informed of ongoing workplace issues involving Plaintiff, and nevertheless failed to take prompt and effective corrective action to stop the conduct. Defendant denied Plaintiff reasonable accommodations and effectively forced her to work in a cramped, poorly lit workspace that exacerbated her medical conditions.

176. Defendant permitted and engaged in unwanted conduct that was severe or pervasive and interfered with Plaintiff's ability to perform her job.

177. Defendant's actions were motivated, at least in part by Plaintiff's disability.

178. Defendant's actions were motivated, at least in part by Plaintiff's protected activity.

179.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered emotional distress, humiliation, economic losses, and out-of-pocket medical expenses.

180.    Defendant subjected Plaintiff to a hostile work environment under Md. Code, State Gov't § 20-601; 20-606.

181.    Plaintiff is entitled to recover compensatory damages up to $300,000, as well as equitable relief, back pay with interest, attorneys' fees, costs, and such other relief as permitted by law under Md. Code, State Gov't § 20-1009.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests unpaid wages, interest, treble damages, compensatory damages up to $300,000, attorneys' fees, costs, and any other relief the Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

 /s/ Abbas S. Sadiq
Abbas S. Sadiq, Esquire
Federal Bar ID: 31831
Sadiq Law Group
555 Quince Orchard Rd, Suite 280
Gaithersburg, MD 20878
301-241-0110 | abbas@sadiqlawgroup.com

*Counsel to Plaintiff, Katherine Humphreys*

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on the 12th day of June 2026, a foregoing Amended Complaint and Demand for Jury Trial was filed and served via CM/ECF system.



*/s/ Abbas S. Sadiq*
Abbas S. Sadiq, Esquire